## Cramer *v.* Alberts, Appellant.

Argued March 23, 1959. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and MCBRIDE, JJ.

*Harry Alan Sherman,* for appellants.

*John A. Metz, Jr.,* with him *Robert Palkovitz, Joseph B. Mitinger,* and *Metz, Cook, Hanna & Kelly,* for appellees.

OPINION PER CURIAM, May 8, 1959:
Judgment affirmed on the following excerpts from the opinion of Judge JOHN J. KENNEDY:

"The above captioned proceeding is a trespass quare clausum fregit suit in which the plaintiffs claimed their coal mine became contaminated and unworkable after the defendants caused sanitary sewers to empty into an air ventilating shaft which led from the surface above into the coal mine. The jury returned a verdict in favor of the plaintiffs in the sum of $15,000. Defendants, by counsel, have filed motions for a new trial and also for judgment n.o.v. for the wife defendant. It is the disposition of these motions that is now before us.

"In January 1947, the plaintiffs (father and son) purchased and received a deed for all of the unmined coal under a tract of land located in Mifflin Boro., Allegheny County. The area, described in the deed, was about 117 acres and granted to the plaintiffs certain surface entry and other mining rights. Nearly a half century earlier the breast coal of the Pittsburgh bituminous vein only had been removed from this mine. It was estimated, after measurements made by the plaintiffs, and an earlier survey made by a civil and mining engineer, that more than 50% of merchantable coal had been allowed to remain in the mine by former owners. This coal consisted of 24 inches of floor coal and numerous pillars, ribs and stumps, most of which, by careful mining, could be removed. It was estimated that this mineable coal was located in a 70 acre area. In 1948 one Andrew DeBaldo purchased the surface

overlying the coal mine. Sometime later he sold part of this surface to the defendants. The defendants erected on this tract, sometime before 1953, forty-five dwelling houses. In 1953, on a contiguous tract of land, the defendants caused forty-two dwelling houses to be erected. There was an air shaft cylindrical in shape and 8 to 10 feet in diameter, and stone or brick lined, that ran from the roof of an entry in the mine up to the surface with a four foot wall or coping above the surface to keep out surface drainage water and was located on surface land still owned by DeBaldo in 1952 and early in 1953. The plaintiffs, under the mining rights in their deed, and also under an agreement with DeBaldo, were entitled to have this air shaft kept open and to be used solely for ventilating purposes in the coal mine below. Sometime in March 1953, the plaintiffs had removed all the merchantable coal through the entry into the mine referred to as the Smith Lane entry. In the mining of pillars, ribs, stumps and floor coal, the procedure is to mine and remove the coal from a substantial distance in the mine from the entry, and then work towards the entry. The plaintiffs had removed coal through this entry above, an area of about six acres. It was decided to close up this entry as required by the State Mining laws and then to locate a new convenient entry into another part of the mine. In seeking such an entry, the younger plaintiff, Calvin Cramer, came to the outlet of the air shaft. It was located in rugged terrain with considerable growth of scrub trees, bushes and weeds. He observed that the wall of the shaft above the surface had been removed and that there was an 8 inch sewer pipe carrying sanitary sewage from one of the developments of the defendants into the mine shaft and flowing into the mine.

"These plaintiffs have travelled a rough road before finally having their case submitted to a jury for a de-

cision. Through their attorney they first brought a bill in equity at the above number and term seeking to enjoin the defendants from disposing of the sanitary sewage from defendants' first dwelling house development and also for damages for contaminating and making unusable the mine until the contamination would be stopped and the filth cleared out. It is significant, although not part of the record in this proceeding, that the defendants, in their answer to the complaint in equity, did not deny they caused the sewer line to drain into an air shaft leading into plaintiffs' coal mine. They only denied the contamination did any damage because all mineable coal had been removed from the area and that they had a legal right to drain sewage into the shaft. At the hearing, the trial chancellor was of the opinion that in order for the plaintiffs to prevail in their prayer for injunctive relief that the owners of the dwelling houses and the owner of the surface under which the sewer line was laid to the shaft, viz., DeBaldo, would have to be made parties defendants. He then ordered that the case be certified to the law side of the court as an action in trespass.

"Amended pleadings were then filed by plaintiffs and defendants. The defendants in their answer and new matter contended that the sewage was not draining into the air shaft but into a large sump which they caused to be excavated and then filled with rock up close to the surface; that this sump was a substantial distance away from the air shaft.

"The proceeding then came on for trial before a judge and jury. Considerable testimony was heard by the jury, who were also taken out on the surface for a view. Before testimony was completed, for some reason that does not appear in the record, or the papers, it was agreed that the jury be discharged and the case be decided by the trial judge without jury. He also

514

heard additional testimony and then, for an undisclosed reason so far as this writer has been able to find, a mistrial was declared. Meanwhile, the defendants caused another 8 inch sewer line to be installed parallel with the first line to carry off the sewage from the additional forty-two houses that they had erected. This line also drained into the same place as the first line.

"The motions ex parte defendants for a new trial give as reasons that the verdict was against the evidence and the weight of the evidence; the law and the weight of the law; was arbitrary, capricious and in disregard of the instructions of the court; was predicated on evidence improperly admitted, and was excessive. . . .

"That there was an air ventilation shaft leading from the surface into the coal mine and located up the draw from Smith Lane Mine entry prior to at least 1952, is acknowledged by the defendants' witnesses, viz, DeBaldo, owner of the surface, and J. W. Edmundson, a civil engineer, who made surveys of the surface to lay out lots for DeBaldo and also plans for the defendants' sewer lines and sump.

"Plaintiffs' witness, Lloyd W. Provost, a former employee of the Pittsburgh Coal Company, which company at a time earlier owned the coal mine, is a mining and civil engineer. He saw the location of the air shaft on numerous occasions. He had surveyed the coal mine as far back as 1926 to ascertain for his employer the amount of coal unmined. He identified the location of the shaft as the same as a marking on plaintiffs' exhibit 9. This exhibit was a photostatic print of part of a large tracing which was made back in 1907 or earlier. He saw the demolished shaft within a year prior to the trial of this case, which was in late November 1957. He described the shaft as being 20

to 25 feet deep, 6 to 8 feet in diameter and with a four foot wall above the surface.

"When the plaintiffs discovered that this sewage was being drained into the air shaft, as they claimed, they sent for William G. Powers, a state bituminous mine inspector. He went on the premises in early 1953, accompanied by the plaintiffs, and testified that the sewage from two eight inch sewer pipes was flowing into a shaft used for mine ventilation, and that he knew that this shaft had 'a connection to the mine,' that it was an air shaft, not a sump.

"Two former jurors on the case that ended in a mistrial and who, as jurors, had viewed the surface involved, were called as witnesses. Joseph Jermalowski testified he saw a hole which he estimated to be 25 to 30 foot deep and 10 feet in diameter into which the sewage was flowing. James E. Taylor, the other juror, an engineering student at the University of Pittsburgh, testified quite extensively concerning the identity of the air shaft stating that the liquid flowing into the hole did not fill it up, that it gave off a sound that it was hitting bottom and that the earth around this hole was undisturbed and that many bushes and trees were growing in its vicinity.

"Cecil G. Alberts, one of the defendants, called for cross-examination, stated he caused a sump to be excavated 70 feet square by 40 feet deep; that it was filled with rock except for a hole left in its center within a foot or two of the surface, which was filled up with soil.

"DeBaldo, the owner of the surface, testified that the sump was not more than 4 to 6 feet deep and that it was not 40 feet deep. If this were true, then when both sewer pipes were emitting water and sewage, such a hole would quickly fill up and then gradually seep into the space between the rocks. Again, the vegetation shown in the photostatic exhibits could not have grown

516

to such size in a short time in the one or two feet of soil at the top of the sump.

"Engineer Edmundson, the defendants' witness, testified that he made surveys and drawings for the two sewer lines and also for the location of the sump, but that he never checked to ascertain if the sump was located where he planned it.

"DeBaldo, testifying for the defendants, stated that before he permitted the defendants to locate the sewer lines under the surface of his property, that he had received some notice that the Boro Council had passed an ordinance that all surface openings leading into coal mines were to be filled in or covered; that he had his workmen fill in the air shaft and level the wall above the surface. In cross-examination he said that what he caused to be filled in might have been a cistern. In any event, it can be inferred that the jury just did not believe him when it was called to their attention that he was being paid twelve and one-half cents per ton royalty on all coal mined by the plaintiffs or their lessee, McFadden. Whether he could have caused the plaintiffs trouble as the owner of the surface if they had not agreed to pay him this royalty is very questionable. However, that is not an issue in this proceeding.

"Both plaintiffs definitely testified that the sewage was emptying into the air shaft and running down into the mine. After purchasing the mine these plaintiffs checked carefully on the air shaft, its condition and its depth from the surface into the mine. The father stood in the mine under the air shaft and the son, on the top, dropped a one hundred foot tape-measure down to him. The over-burden measured 25 feet. The younger plaintiff, a high school graduate and a pilot of bomber planes in World War II, certainly was trained to store in his memory the exact location of the air shaft on the

surface. He hardly could confuse it with a sump, such as described by Mr. Alberts. The older plaintiff, a coal miner of more than 25 years experience, testified that there was a bad odor in the mine in 1952. At that time they were working towards the mine entry. Because he thought the odor was caused by the mules they were using in the mine he made no further investigation.

"The plaintiffs had leased five acres of the mine to one McFadden. His entry to this coal was about one thousand feet away from the Smith Lane entry. Plaintiffs testified that McFadden had removed what he considered all the merchantable coal from his leasehold in the spring of 1953 also, and had shut down its operation.

"The defendants called as a witness one Jake Smith who stated that he worked for McFadden until April 1954 and that there was no odor of sewage where this leasehold was located. He stated that he quit work promptly when he reached age 65 because he was a member of a local of the United Mine Workers and became eligible, applied for and received a substantial pension under the provisions of the National Bituminous Coal Wage Agreement of 1950. On cross-examination, Mr. Smith was asked when he was born and he stated April 16, 1888. He, therefore, became 65 in April 1953, not 1954. . . .

"Defendants, on April 8, 1958, filed an additional motion for a new trial based on alleged after-discovered evidence claiming that photostatic exhibit 9, which shows the surface of the 'Forsythe Farm' under which the plaintiffs' coal mine was located, and also that of the abutting property owner, had been tampered with and that the alleged marking which Provost stated was the engineer's symbol for the location of the air shaft on the surface had been recently placed on this exhibit and was not on a similar photostat referred to as plain-

tiffs' exhibit 5, and which was used at the former trial. Not observing at the time that the affidavit supporting this motion had been made on December 20, 1957 a rule to show cause was granted. The plaintiffs' answer denied any recent additions to the photostat. All these photostats were furnished by the owner of the original tracings from which they were made by their owner, the Pittsburgh Consolidated Coal Company. Plaintiffs' exhibit 5 at the former trial had been presented at pre-trial for the equity case held on February 2, 1954. We have been furnished with both exhibits. They are exactly the same as to all markings, etc., except that exhibit 9 is a larger photostat than exhibit 5. At oral argument of the defendants' motion, held before us on April 15, 1958, counsel for the defendants requested the right to take depositions to support the after-discovered evidence contention and that said depositions would be filed within a period of two weeks. . . . Counsel for the defendants now agrees that we should not be asked to wait any longer in disposing of the defendants' various motions, as aforesaid.

"As we interpret the defendants' brief concerning this so-called after-discovered evidence, same would not warrant the granting of a new trial because, as aforesaid, both exhibits 5 and 9 have the same markings on them, and the testimony of the witness whose deposition was taken, and who is an official of the Pittsburgh Consolidated Coal Company, can only state that he did not know when the air shaft symbol was placed on the tracing in lead pencil,—this symbol consisting of a drawing of two arrows pointing in opposite directions and diamond shaped,—and that such a symbol is not used now nor so far as he knows at any time to designate an air shaft location on a tracing of the surface of a coal mine. This alleged deponent gave practically the same testimony when he was called as a witness

for the defendants in the current trial. It might be mentioned that after this witness identified defendants' exhibit E as part of the tracing of the mine surface, that it was offered in evidence by the defendants' counsel and it is exactly the same, as to marks, as the plaintiffs' exhibits 5 (at former trial) and 9 (at this trial).

"There is no merit to the defendants' contention, as argued in their attorney's brief, that the plaintiffs had abandoned any rights they had in the mine before it became contaminated from the sewage flowing into it. Abandonment is an affirmative defense and must be clearly proven. It has been held that the air space in the mine from which coal has been removed remains the property and under the control of the owner of the coal mine with mining rights and which estate had been severed from the surface estate. There is not a scintilla of evidence that the plaintiffs, at any time, abandoned any of their rights in this mine which they purchased in 1947.

"The verdict of $15,000 is not excessive but, on the contrary, in our opinion, is too modest. Calvin Cramer testified that when he took Mine Inspector Powers to see the sewage flowing into the air shaft that Powers ordered the mine to be entirely shut down because of the contamination and the gases that would generate from it. He testified that in his opinion that the mine, as a whole at that time, had a market value of $60,000. There is ample evidence that in order to comply with the mining laws of the State that to reopen this mine two separate entries would have to be made, a new air shaft installed, and a power driven fan placed in the building at the surface of the air shaft. Further, that the mine would have to be thoroughly decontaminated. The cost to do all these things was estimated at at least $125,000, double what the mine was worth at

the open market, according to the young plaintiff. The other plaintiff (the father) gave as his opinion that the fair market value at the time of the mine's closing was between $50,000 and $60,000. The jury probably took into consideration that eleven acres of the mine had had its coal removed and also that the purchase price in 1947 was $6000, although it was explained that considerably more money had to be invested in bringing electricity to the mine, buying mine cars, trackings, cleaning it out, etc. The jury could readily have found from credible evidence that the conduct of the defendants in draining this sanitary sewage through the air shaft into the mine was deliberate, wilful and ruthless.

"The contention that the wife defendant should be granted judgment n.o.v. is unmeritorious. She was a co-owner of the houses that were built. No objection was made to admitting into the record, from the amended complaint, the following averment: 'Defendants constructed or caused to be constructed an 8-inch sanitary sewer to drain from said houses and buildings prior to the entry of suit at the above number and term, and some time subsequent to the entry of said suit constructed or caused to be constructed a second 8-inch sanitary sewer to drain from other of said houses and buildings.' This wife defendant did not file any separate answer denying legal responsibility apart and distinguished from that of her husband.

"A rereading of the transcribed testimony and charge of the court discloses no substantial errors on rulings on evidence or in the charge. The trial was conducted with extra care because of the outcome, as aforesaid, of prior proceedings."